# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-40240

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

VICTOR VARGAS,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

March 7, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:15-CR-285-1

Before STEWART, Chief Judge, and JONES and OWEN, Circuit Judges.

PER CURIAM:*

Defendant-appellant Victor Vargas was captured in a Homeland Security sting operation and convicted of enticing and transferring obscene material to a minor. On plain-error review, he contends that the district court erred in responding to a jury question regarding the entrapment defense. Because the district court did not err, we **AFFIRM**.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-40240

## BACKGROUND

In March 2015, Homeland Security Special Agent Jeffrey Williams adopted the user name "Daisy" and entered an online chatroom on a website called "Laredo Heat," which is based in Laredo, Texas. Vargas was in the chatroom under the user name "Sex." Vargas messaged Daisy (treated as a real person for background purposes) and asked for her age and gender. Daisy told him that she was a 14-year-old girl. Vargas immediately asked whether Daisy could meet, and Daisy said, "i would like that." Vargas asked Daisy what she wanted to do, and she asked whether he wanted oral sex or sex; he asked for "both."

The next day Vargas again messaged Daisy in Laredo Heat and asked if they were going to get together. Daisy said, "well hell yeah what are you into?" Vargas said that he was into "everthing" and asked, "were can I meet you." Daisy replied, "first of all we should keep it a secret bc im 14 don't want anybody to see us right?" Vargas agreed. Daisy also told Vargas that she could send him a photograph of herself, and Vargas supplied both a phone number and email address to which Daisy could send the photograph.

Daisy and Vargas then moved from Laredo Heat to email. Daisy sent Vargas a photograph of a female special agent's face. In response, Vargas said, "Hey can I see you body." Daisy asked whether Vargas wanted her to be clothed or nude in the photograph, and Vargas said "both." Daisy also suggested that Vargas send her a picture of his genitalia; Vargas responded by sending her a graphic photograph. Vargas renewed his request for a photograph of Daisy "with out clothes" and asked whether he should buy condoms and where he should pick up Daisy. Vargas also twice asked to call Daisy, but she told him that she did not yet have a phone. Daisy told him that he should buy condoms because she did not want to get pregnant and that they

2

could "probably meet at the new taco bell." Vargas told Daisy that he would pick her up in a light silver GMC truck at 7:00 p.m. at the Taco Bell.

Vargas arrived much earlier at the Taco Bell, however. Vargas emailed Daisy "I'm here" shortly before noon. At that point, Special Agent Matthews headed to the Taco Bell and, when he arrived, emailed Vargas, "got brothers phone. i see a gmc truck." Vargas asked where Daisy was, and Special Agent Matthews responded, "im in taco bell can you get me a drink."

Shortly thereafter, federal agents converged on Vargas's silver GMC. They found him with a cell phone that matched the number Vargas gave Daisy in Laredo Heat. In addition to containing Vargas's email address and emails to Daisy, the cell phone contained the graphic photograph Vargas sent Daisy. The agents also found condoms and a Taco Bell soft drink in the center console of the GMC. Vargas told the agents he was merely buying tacos for his wife.

Vargas was indicted for enticing and transferring obscene material to a minor. After pleading not guilty, Vargas raised entrapment as a defense at trial. A jury nonetheless convicted him. He was sentenced to 151 months of imprisonment.

The issue in this case concerns the district court's statements to the jury about entrapment. Vargas agrees that the district court properly instructed the jury on entrapment: a person is a victim of entrapment if (1) the person was not predisposed to violate the law, and (2) law enforcement officers induced him to violate the law. *E.g.*, *United States v. Thompson*, 130 F.3d 676, 689 (5th Cir. 1997). Vargas complains, however, of the district court's subsequent statements to the jury. During jury deliberations, the jury submitted the following question to the court: "[w]ere the questions and statements of the agent legal?" The judge stated that he had "no idea what that means" and called the jury into the courtroom to seek clarification about the question. The foreperson explained that a juror wanted to know whether

No. 16-40240

"the actions of the agent, in the language that they used in some of the statements and questioning, were within a legal scope, I guess, you could say. Were they legal, the word, the usage of his statements and questions." The judge responded, "Of course, they're legal. Why would they not be legal?" The following conversation then occurred:

> THE COURT: They – people – these teams are set up to try to see – to try to apprehend people they think are dangerous. And so they can – as I gave you the entrapment thing, you can – law enforcement can take a role and see if – put out some bait and see if the bait leads to something, and then try to develop it to – to bring a charge against somebody they think they need to bring a charge against. And then you – of course, you decide whether it's guilty or not. But, other than that, I don't know what the question is. I don't understand.

> THE JUROR: I think maybe the concern was in the – in the way they did it with the procedures, the policies.

> THE COURT: We're not here to judge that, ma'am. The way – that's very standard operating –

> THE JUROR: It's a question that's come up and it's kind of stalling the process.

> THE COURT: There's nothing absolutely illegal at all about the procedures – they – those are done all over the country and here, too. I mean, that's the way to try to cut off – and I'm not saying the Defendant is guilty, but that's a way to try to cut off potential child abusers. Because they have an idea of where you might find them.

> And so they sometimes set out a – see what's out there and they find one, and then it leads to this. And it leads to this or not to this, but – and it may be the argument of the Defendant is, "Well, I really – I was just following along and the person was doing most of the talking. I had – I didn't have anything on my mind. I was just kind of answering." Fine. Then, if so, then he's not guilty, if that's what you believe beyond a reasonable doubt. But I don't know what else the question is.

> There's nothing wrong with that procedure of trying to apprehend child perverts, to try to – to try to find them and apprehend them before they do something else. I'm not saying he's one of those. I'm

4

not saying he's guilty. But there's nothing wrong at all with that procedure. It goes on all the time.

Does that answer you?

THE JUROR: I'm not sure.

THE COURT: Well, I can't – I don't know what else to tell you. That's way beyond the instructions I've given you. I didn't ask you here to question the – the law enforcement practices. There's no – that's not being raised at all.

THE JUROR: I think that statement will – will help.

THE COURT: I guess, what I need to do now is ask you to go in there and I have to ask the lawyers now if they think I've missaid anything. If so, I'll bring you back out again. But go on in there and let me – outside of your presence, I have to ask them if I – if they disagree with what I said.

The jury then left the courtroom, and the attorneys stated that they had no objections to the court's responses to the jury's question. After the jurors indicated that they wished to continue deliberations the following day, the district court again referenced the jury's question:

THE COURT: Okay. You want to go home. That's fine. It's been a longer day than I expected, but it is late. Don't discuss the case with anyone. Don't let anybody discuss it with you. Please, I beg of you, don't go out and start researching anything, or look up web pages, or Facebook, or anything like that. That's a gross violation of your duties if you do that. And don't – just let it be.

And I'm sorry if I was a little bit frustrated by the last question, because I was frustrated. But I know you're trying to do your best. But let me just say this to you one more time. Remember, I told you, you have to follow the law as I give it to you. I told you what the law is.

And I – what I told you to decide is whether, under the law and based on what you heard, the Defendant knowingly was trying to entice a young girl under the age of 14. And, second one, was he mailing something, which he was, to somebody he thought was a young girl. And you find – or do you find that that picture of that penis, under the rules I gave you there, is, under contemporary standards and in the context of it, obscene.

No. 16-40240

Please don't go off the railroad tracks into whether – you want to analyze where the police procedures are fine or whether they should be done that way. This is not a civil rights suit against the police department or the investigators. What they do is common all over the nation. It's a way to catch people in – that they need to look for in that area.

I'm not saying this man is guilty or not guilty, but there's a lot of that going on in the nation. And they have these teams that are trying to cut down on – on child molesting, abuse. And so there's nothing wrong with that at all.

If you are out there trying to decide is that the right system, and should it be done that way, and all that, you're way off the track. And, please, get back on the track and decide whether you think, under these facts, with this situation here, this man is guilty beyond a reasonable doubt or not.

It's him and this, but not – nobody asked you to judge the whole operation. Please don't do that. I mean, please, get back on the trail and do whatever your verdict is. I mean, I – whatever your verdict is, your verdict is. But just base it on what we're doing here, not something else. So have a nice night.

Please don't research more. Don't get deeper into other things, even – than you might be already. And I don't mean to say that offensively. I'm just saying what your forelady said, that you're – some – off on is this legal, and what's happening here, and all that, which is way off the mark. So get a good night's sleep and let's start – what time do you want to come in, Madam Foreman?

I'll give you the option, 9:00, 8:30, whatever you want. I mean, just agree on it, whatever you –

THE JUROR: Can we confer?

THE COURT: Sure. That's another – are you going to get a unanimous verdict. Confer.

THE JUROR: 9:00 o'clock, Your Honor. And may I say something?

THE COURT: Yeah. But don't say things that – sure.

THE JUROR: No, no, no. But just in response to what you said. I don't think that the panel is off track, but to be prudent – to make sure that everybody's questions were answered, we submitted it just to be sure, so that they – any individual that had a question could move on.

6

No. 16-40240

THE COURT: The only reason I said that is because what you said to me. You said I think that – well, even you question was, "Is what happened legal?" And I – none of us understood that. The lawyers didn't understand it. I didn't understand.

Then you told me is – something about is that a legal procedure and all that stuff, way off base. Maybe only one person had that question. That's fine. I just want to stress don't go down that road, not even one of you go down that road, because that's not what we're about.

So I didn't mean to offend anybody. I just want to make that clear. That's – I've never had a question – I've been doing this for 36 years. I've never heard a jury say is all of this legal. I don't – I didn't know what that meant, but anyway. Have a good night.

The district court released the jury with the promise that coffee and rolls would await them in the morning. The attorneys again made no objections to the district court's statements.

Vargas contends that these statements constitute clear errors that affected his substantial rights because he "did not have an opportunity to meaningfully have his entrapment defense considered by the jury[.]"

## DISCUSSION

Where a defendant did not contemporaneously object to perceived errors, this court reviews his claims on appeal for plain error. *E.g.*, *United States v. Hernandez*, 690 F.3d 613, 620 (5th Cir. 2012). To prevail on plain-error review, the defendant must establish (1) an error, (2) that is clear or obvious, and (3) that affected his substantial rights. *Id.* (citing *Puckett v. United States*, 556 U.S. 129, 235 (2009)). If the defendant satisfies all three prongs, this court has "discretion to correct the error but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Hernandez*, 690 F.3d at 620. Vargas concedes that he did not contemporaneously object to the district court's statements to the jury. We therefore review his claims for plain error.

7

No. 16-40240

Vargas attacks the district court's statements in two interrelated claims on appeal. First, he argues that the district court erred by "essentially instructing the jury to disregard the element of inducement in the entrapment defense, when the [court] made several inappropriate comments to jurors about the Government's tactics during the sting operation stating that the conduct was 'legal' and that there was 'nothing wrong' and the jurors are 'not here to judge that.'" In his view, "the court's answer was [not] reasonably responsive to the jury's question[] and [] the original and supplemental instructions as a whole [did not] allow[] the jury to understand the issue presented to it." *United States v. Stephens*, 38 F.3d 167, 170 (5th Cir. 1994). Second, he argues that the district court went "beyond providing assistance to the jury" by becoming "an expert witness for the prosecution," giving "his personal opinions favoring sting operations," and "showing bias against the defense including statements that there is 'nothing wrong' with sting operations and [that] they are merely a method of catching the 'dangerous' and [a] 'procedure of trying to apprehend child perverts . . . before they do something else.'" Vargas contends that the district court ran afoul of *Quercia v. United States*, 289 U.S. 466 (1933) by assuming the role of a witness, adding to the evidence, and making one-sided, misleading statements. We disagree.

Vargas's contention that the district court essentially instructed the jury to disregard the inducement element of the entrapment defense mischaracterizes the record. Read holistically, the transcript shows that the court instructed the jury to ignore the issue of the legality of sting operations, not the inducement element. Vargas does not dispute that the inducement element of the entrapment defense has nothing to do with the legality of sting operations. Entrapment, after all, is a defense, not a civil rights cause of action or remedy akin to the exclusionary rule both of which turn on the legality of certain conduct. When asked by the jury whether the sting operation was

8

legal, therefore, the district court correctly instructed the jury that they were not tasked with deciding that question. Vargas attempts to recast that instruction as one directing the jury to disregard inducement. But the instruction was correct, and the court never told the jury, as Vargas suggests, to disregard Special Agent Williams's conduct in determining whether Vargas was induced to commit these crimes. The court only instructed the jury, and rightly so, to avoid the irrelevant question of the *legality* of Special Agent Williams's conduct. This contention is meritless.

In a similar vein, we reject Vargas's argument that the district court's instruction was not reasonably responsive to the jury's question. The question was whether the sting operation in this case was legal. No fewer than five times, the district court assured the jury that sting operations are legal and that, in any event, the legality of the operations was not before the jury. Quoting selectively from the record, Vargas argues that the district court muddied the waters by confusing the jury on the inducement element of the entrapment defense. But, as noted above, the district court limited itself to addressing the jury's question and keeping the jury on track. The instruction was more than reasonably responsive and well within the "wide latitude" the court enjoys "in deciding how to respond to [jury] questions." *Stevens*, 38 F.3d at 170.

We also reject Vargas's allegations that the district court became an expert witness for the Government. Vargas complains that the district court overstepped its bounds by describing sting operations as common methods of catching dangerous child perverts. Vargas says the court implied that such operations are good and that he is a dangerous child pervert. The transcript tells a different story. The court's comments occurred in the context of its response to the question whether sting operations are legal. Far from impermissibly "distort[ing]" the evidence or "add[ing] to it," *Quercia*, 289 U.S.

at 470, the district court explained the purpose of sting operations in the course of telling the jury why the legality of sting operations is completely irrelevant. Further, the court took care not to taint the jury's view of Vargas.  In both of its colloquies with the jury, the court repeatedly cautioned, "I'm not saying this man is guilty or not guilty."  We assume that jurors follow the court's instructions. *See, e.g.*, *United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995) ("We presume that the jury follows the instructions of the trial court unless there is an 'overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating.'" (quoting *United States v. Barksdale-Contreras*, 972 F.2d 111, 116 (5th Cir. 1992))).  Taken together, the court's comments demonstrate a careful effort to answer the jury's question while maintaining neutrality toward Vargas's innocence or guilt.  No error occurred.

Because Vargas has not demonstrated error, much less clear error, we **AFFIRM**.